NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|                          |     |                               |
|--------------------------|-----|-------------------------------|
| In the matter of         | :   | Case No. 04-46898/JHW         |
|                          |     |                               |
| THCR/LP Corporation, et al. | :   | **OPINION ON MOTION TO**      |
|                          |     | **ENFORCE PLAN RECORD**       |
| Debtor                   | :   | **DISTRIBUTION DATE**         |

_____

APPEARANCES:    Michael J. Viscount, Jr., Esq.
                Joshua T. Klein, Esq.
                Fox Rothschild
                1301 Atlantic Avenue, Suite 400
                Atlantic City, New Jersey  08401
                Counsel for Movants

                Gerald W. Berger, Esq.
                First National Tower
                106 S. Main Street, Suite 2500
                Akron, Ohio  44308-1447
                Counsel for Movants

                Charles A. Stanziale, Jr., Esq.
                Jeffrey T. Testa, Esq.
                McElroy, Deutsch, Mulvaney & Carpenter
                Three Gateway Center
                100 Mulberry Street
                Newark, New Jersey  07102-4079
                Counsel for Debtors

                Robert A. Klyman, Esq.
                Latham & Watkins
                633 West 5th Street, Suite 4000
                Los Angeles, California  90071-2007
                Counsel for Debtors

FILED
JAMES J. WALDRON, CLERK
2/17/06
U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: s/ M. Boyer      DEPUTY

John W. Weiss, Esq.
Mark A. Broude, Esq.
Latham & Watkins
885 Third Avenue, Suite 1000
New York, New York  10022-4802
Counsel for Debtors

Michael F. Walsh, Esq.
John J. Rapisardi, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York  10153
Counsel for TAC Noteholder Committee

Jack M. Zackin, Esq.
Sills Cummis Epstein & Gross
One Riverfront Plaza
Newark, New Jersey  07102
Counsel for TAC Noteholder Committee

Warren J. Martin, Jr., Esq.
Porzio, Bromberg & Newman
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey  07962
Counsel for TCH Noteholder Committee

Thomas R. Kreller, Esq.
Millbank, Tweed, Hadley & McCloy
601 S. Figueroa Street, 30th Floor
Los Angeles, California  90017
Counsel for TCH Noteholder Committee

Frank A. Merola, Esq.
Stutman, Treister & Glatt
1901 Avenue of the Stars, 12th Floor
Los Angeles, California  90067
Counsel for Equity Committee

Steven M. Yoder, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, Delaware  19801
Counsel for Equity Committee

Anthony Sodono, III, Esq.
Office of the United States Trustee
One Newark Center
Suite 2100
Newark, New Jersey  07102
Counsel for the UST

The movants, a group of shareholders who previously held common stock
in Trump Hotels & Casino Resorts, Inc. (referred to hereinafter as "Old THCR
Common Stock") prior to the confirmation of its reorganization plan, seek here
to have the court enter an order enforcing the "Record Date" as established by
the debtor's confirmed Chapter 11 plan.  The movants contend that they are
the claim holders and intended beneficiaries under Class 11 of the debtor's
plan.  By this motion they seek to compel the debtor to make a distribution of
cash and warrants to them.  The debtor maintains that when the movants sold
their shares after the record date and prior to plan distribution, they
transferred their right to receive a distribution from the debtor's estate.  For the
reasons expressed below, the movants' motion is denied.

## FACTS

On November 21, 2004, Trump Hotels & Casino Resorts, Inc. ("THCR" or

"the debtor") and certain of its affiliates filed voluntary petitions under Chapter

11 of the Bankruptcy Code.  An Equity Committee was appointed by the United

States Trustee on December 28, 2004.

The debtor's Second Amended Joint Plan of Reorganization ("plan") was

confirmed on April 5, 2005, as amended by order dated April 11, 2005.  The

debtor's plan created an impaired Class 11, consisting primarily of the

"beneficial owners" of Old THCR Common Stock.  See Plan at § 3.04(k) at 34.

Under the debtor's plan, each holder of an allowed Class 11 claim on the

effective date of the plan shall:

> (i)  to the extent such holder holds Old THCR Common
> Stock, retain its existing shares of Old THCR Common Stock,
> subject to the Reverse Stock Split and dilution upon issuance of
> the New Common Stock;[1]

> (ii)  to the extent such holder held Old THCR Shares as of the
> New Class A Warrants Record Date, receive, on a Pro Rata basis,
> (a) New Class 11 Class A Warrants,[2] (b) the World's Fair Sale

---

[1] The Reverse Stock Split was defined as "the 1000 to 1 reverse stock
split of Old THCR Common Stock effected under Section 5.11(b) of the Plan on
or immediately prior to the Effective Date."  Plan at § 2.01 at 18.

[2] New Class A Warrants were defined as "certain one (1) - year warrants,
which will be issued in part to:  (i) holders of Old THCR Shares; and (ii) DJT

Proceeds,[3] and (c) the Class 11 Cash Payment.[4]

Id. Thus, to the extent each shareholder held shares as of the effective date of

the reorganization plan, he or she would be entitled to receive one new share in

the reorganized company for every 1000 old shares owned.  To the extent such

shareholders held shares as of the record date specified in the plan, the

shareholders were entitled to receive warrants, a cash payment per share, and

a pro rata share of the net proceeds from the sale of the World's Fair site.


The "New Class A Warrants Record Date", originally set for February 9,

2005, was modified at confirmation to March 28, 2005 by agreement of the

debtors and the Equity Committee.[5]  The Amended Confirmation Order entered

_____

(Donald J. Trump), to acquire up to an aggregate of 3,425,193 shares of New
Common Stock."  Plan at § 2.01 at 11.

   [3] World's Fair Sale Proceeds were defined as the net proceeds from the
sale of a parcel of land in Atlantic City, New Jersey.  Since the plan was
confirmed, the site has been sold, and the proceeds have been escrowed.  Plan
at § 2.01 at 21.

   [4] The Class 11 Cash Payment was "an amount in cash equal to
$17,500,000," or $0.88 per share.  Plan at § 2.01 at 5.

   [5] Frank Merola, Esquire, representing the Equity Committee,
commenting on the issue of the Record Date, suggested that unless the change
to March 28, 2005 was made, shareholders on February 9 who subsequently
sold their shares would be entitled to the distribution proposed under the plan.

      After consulting with a number of the constituencies in the
   case, it seems appropriate to move that record date to something
                                                      (continued...)

on April 11, 2005 confirmed the New Class A Warrants Record Date, as well as

the Distribution Record Date, as March 28, 2005.

Under the distribution provisions of the plan, the debtor was required to

make distribution to the holders of record on the Distribution Record Date, as

follows:

> As of the close of business on the Distribution Record Date,
> the transfer registers for any Old THCR Securities maintained by
> the Debtors, or their respective agents, will be closed, and any
> distributions made prior to such date will be irrevocable.  The
> Disbursing Agent and the respective agents of the Debtors will
> have no obligation to recognize the transfer of . . . , Old THCR
> Common Stock . . . occurring after the Distribution Record Date,
> and will be entitled for all purposes relating to the Plan to
> recognize and deal only with those holders of record as of the close
> of business on the Distribution Record Date.

---

[5](...continued)
closer to the confirmation date.  And let me tell you what we're
concerned about.  As currently drafted, the holder of the common
stock as of February 9 is entitled to distribution.  That would mean
people that sold the stock between February 9 and today, both
receive the proceeds from the sale of the stock and would be
entitled to the distribution.  We think that might come as a
surprise to some of the people who bought the stock in the ensuing
period.

We proposed and the debtor has acquiesced to moving the
Class A warrant record date to March 28th.  The magic of that date
is that was the press release date for the settlement of the Equity
Committee.  We don't believe this is a substantive change in any
way.  It's just marking which of the stockholders receive the
distribution.

T 19-13 through T 20-6 (4/5/05).

Plan at § 8.02(b)(iii) at 54.


The Effective Date of the plan, originally contemplated to occur prior to

May 1, 2005, was delayed.  On May 12, 2005, the debtor moved for an order

modifying the Second Amended Joint Plan of Reorganization to reflect that the

"Distribution Record Date" and the "New Class A Warrants Record Date"

should be the anticipated Effective Date, May 20, 2005.  The debtor explained

that the trading pattern of Old THCR shares since March 28, 2005 indicated

that:

> either (i) parties in the market are confused regarding the intended
> function of the Plan's Record Date (otherwise no party should have
> been willing to pay more than a few cents per share for the Old
> THCR Shares after March 28, 2005, because such a purchaser
> would not be entitled to receive any of the Plan's primary
> distributions for those shares), or (ii) parties in the market are
> aware of a mechanism external to the Plan that will cause Plan
> distributions to [be] made to holders of Old THCR Shares as of
> some date subsequent to the Record Date (i.e. the Effective Date).

Debtor's Motion to Modify at 2.  The debtor believed that "[e]stablishing a

Record Date that is the same day as the Effective Date will provide the greatest

certainty that the party who holds Old THCR Shares when the Plan

distribution process begins will be the same party who receives such

distributions."  Id. at 2-3.  The debtor maintained that such an adjustment

would "avoid any unjust enrichment based on the sale of Old THCR Shares"

after the original record date of March 28, 2005.  Id. at 5.  Oral argument on

the debtor's motion to modify was heard on May 18, 2005.  Debtor's motion to

move the Effective Date to on or before May 23, 2005 was granted, but the

motion to adjust the Record Date was denied.  See Amended Order dated May

19, 2005.  Following the Effective Date of May 20, 2005, the debtor, through its

disbursing agent, the Continental Stock Transfer & Trust Company

("Continental"), made distributions of warrants and cash to the record holders

of Old THCR Common Stock, as of the Distribution Record Date.  In turn, the

record holders distributed the warrants and cash to the beneficial owners of

the stock as of the Effective Date.

The movants herein are a group of 17 former owners of Old THCR

Common Stock,[6] who were beneficial owners as of March 28, 2005, but who

sold their stock between the March 28th Record Date and the May 20th Effective

Date.  The movants contend that as Class 11 "beneficial owners" who held Old

THCR Common Stock as of the Record Date, they were entitled to receive the

distribution provided for under the plan, notwithstanding the fact that they

each sold their shares on the open market prior to the plan's Effective Date.

On June 28, 2005, they filed this motion to enforce the plan Record

Distribution Date.

---

[6]      Four of the seven members of the Equity Committee are movants
herein.

-8-

The debtor opposes such relief on several grounds, including that: (1) the debtors properly implemented the plan by making distribution to the holders of record of Old THCR Common Stock, and that they were not required to make a distribution directly to beneficial owners such as the movants; (2) the plan required the surrender of certificates of stock as a precondition to the receipt of a distribution under the plan, which the movants did not do, and (3) when the movants elected to sell their shares after the Record Date, they freely entered into contracts to sell their shares in markets regulated by the NASD. By selling their shares, the debtor contends that the movants effectively assigned their rights to the future distributions to the new purchaser, in accordance with NASD rules.

Oral argument in this matter was held on July 18, 2005 at which time the parties were afforded the opportunity to make additional submissions. Further argument was considered on October 28, 2005 and final decision was reserved. The parties were given an additional opportunity to discuss settlement for a period of time, but were unable to resolve the matter.

**DISCUSSION**

I.    <u>Beneficial Holder vs. Record Holder</u>.


The debtor's contention, that distribution under the plan was only required to be made to the "record" holders, is not inconsistent with the movants' claim that those distributions were intended for the "beneficial" holders of the stock.  As the movants correctly highlight, the beneficiaries of Class 11 were intended to be the "beneficial" owners of Old THCR Common Stock.  <u>See</u> Plan at § 3.04(k) at 34.  The "beneficial" owners, most of whom held their shares not as record owners, but through financial institutions in "street name", would have received their distribution through the holder of record of their shares, the Depository Trust Company ("DTC").  Section 8.02(b)(iii) of the plan authorized the debtor's disbursing agent to "deal only with those <u>holders of record</u> as of the close of business on the Distribution Record Date") (emphasis added).  The plan envisioned that the debtor would rely upon the registry of record holders to determine entitlement to distribution as a "holder" of the Old THCR Common Stock as of the Record Date.  The distribution would then pass from the record holder to the beneficial holder who actually purchased the stock.

-10-

In this case, the disbursing agent, Continental, actually made most of the Class 11 distribution to the DTC as the record holder.  DTC, which "registers its shares on companies' share registers under the name 'Cede & Co.'", is recognized as "the world's largest securities depository."  It serves as a clearing house, holding shares on behalf of various banks, brokers, firms and other funds, who in turn hold those shares for their participants.  John C. Wilcox and John J. Purcell III, <u>"Street Name" Registration & the Proxy Solicitation Process</u>, § 12.2[2] at 12-5 to 12-6.  This type of ownership is commonly known as "street name" registration, and is the standard mechanism for holding public shares of stock.  The process serves to "facilitate securities trading, eliminate paperwork and preserve the confidentiality of beneficial owners' identities."  <u>Id</u>. at § 12.1 at 12-3.[7]

_____

[7]     <u>See</u> Debtor's Obj., Exh. 26 (John F. Olson et al., <u>Excerpt from Recent Developments in Federal Securities Regulation of Corporate Finance, as of August 2004</u>, 1456 PLI/Corp. 45, 79 (Nov. 11-13, 2004)) ("an estimated 70-80 percent of all public companies' shares are held in 'street name,' meaning that they are held of record by brokers, banks or their depositories. Most street name shares are registered in the name 'Cede & Co.,' . . . which holds shares on behalf of its participant brokers and banks.  These participant brokers and banks in turn hold the shares on behalf of their clients, the individual beneficial owners. Under this 'daisy chain' system, state law deems DTC to be the 'legal' owner of the shares, and DTC therefore possesses all of the rights incident to share ownership, including the right to vote.").  <u>See</u> <u>also</u> Debtor's Obj., Exh. 24 (SEC Website Explanation of "Street Name")  ("When you buy securities through a brokerage firm, most firms will automatically put your securities into "street name." This means your brokerage firm will hold your securities in its name or another nominee and not in your name, but your firm will keep records showing you as the real or "beneficial owner." You will not get
(continued...)

Here, the distribution from the debtor's disbursing agent to DTC was intended to ultimately reach the actual beneficial holders.  The debtor's attempt to focus on the distinction between record holders and beneficial holders to contend that the movants were not entitled to direct distribution under the plan because they were not the record holders of Old THCR Common Stock must fail.

II.    <u>Surrender of Stock Certificates</u>.

The debtor alternatively contends that it was only obligated to make distribution to those shareholders who surrendered their stock certificates.  Because the movants did not turn over stock certificates, they were not entitled to a distribution.  As a condition precedent to distribution, the plan requires that all claim holders "tender the applicable instruments, securities or other documentation evidencing such Claim or Interest."  Plan at § 8.07 at 56.  In accordance with the plan, "[e]ach holder of a certificated Old THCR Common Stock Interest [was to] tender its Old THCR Common Stock instruments relating to such interest to the Reorganized Debtors or their agents . . . as promptly as practicable following the Effective Date."  <u>Id</u>. at 57.

---

[7](...continued)
a certificate, but will receive an account statement from your broker on at least a quarterly and annual basis showing your holdings.").

The debtor determined that as of March 28, 2005 there were 19,943,877

total shares of Old THCR Common Stock held by all holders of record (other

than shares held by or for Donald J. Trump).  The DTC was listed as the holder

of record for 19,691,513 of those shares.  Debtor's Obj., Exh. 6 (Aff. of William

F. Seegraber).  The stock certificates for the DTC shares were held by DTC's

nominee, Cede & Co., and were surrendered to the debtor's disbursing agent.

At the first hearing on this motion, debtor's counsel acknowledged that the

certificates representing those shares were in fact surrendered to the

disbursing agent.  See T13-6 through 17 (7/18/05).  The certificates were

surrendered and distribution occurred under the terms of the plan.  Debtor's

contention in this regard must also fail.


III.    Plan Provisions Versus Marketplace Requirements.


As a threshold matter, the movants correctly note that the plan clearly

provides that to the extent that beneficial owners of Old THCR Common Stock

held such stock "as of the New Class A Warrants Record Date", i.e., March 28,

2005, they were entitled to receive the distribution package promised to Class

11 holders under the plan.[8]  Notwithstanding these concerns, the issue

_____

[8] Prior to the Effective Date of the plan, several parties in interest,
including the Equity Committee seeking to move the record date from

(continued...)

squarely presented now, previously unresolved, is whether the sale by the

movants of their Old THCR Common Stock between March 28, 2005, the

Record Date, and May 20, 2005, the Effective Date, defeated the opportunity of

the movants to receive the plan distribution to which they would have

otherwise been entitled.  Because I conclude that the movants' voluntary entry

into the securities marketplace subjected them to the rules of that

marketplace, and caused the sale not only of the movants' shares of stock,

which would become worthless following the Reverse Stock Split on the

Effective Date, but also the distribution package otherwise attaching to the Old

THCR Common Stock, I must deny the movants' quest for relief.


The rules of the securities marketplace to which the movants subjected

themselves when they determined to sell their stock are established by the

National Association of Securities Dealers ("NASD").  NASD is a national

securities association registered with the Securities and Exchange Commission

("SEC") pursuant to Section 15A of the Securities Exchange Act of 1934, as

---

[8](...continued)
February 9, 2005 to March 28, 2005, see supra n. 5, and the debtor, seeking to
move the record date from March 28, 2005 to May 20, 2005, expressed concern
that the plan as written suggested that shareholders who held shares as of the
Record Date and sold their shares prior to the Effective Date, would be entitled
to receive the Class 11 distribution.  See Debtor's Motion for Approval of
Technical Modifications to the Second Amended Joint Plan of Reorganization,
May 12, 2005.

amended.  The NASD is authorized by the SEC to adopt and administer the

Uniform Practice Code ("UPC"), the rules and regulations governing over-the-

counter secondary market securities transactions.  Pursuant to SEC Rule 10b-

17, parties are required to provide notice to the NASD no later than 10 days

prior to the record date of their intent to make distributions or offer dividends.

Debtor's Suppl. Submission, Exh. 1 to Exh. A. (Aff. of Carla A. Proto).  The UPC

governs how distributions by security issuers must be allocated to the holders

of securities.  Determinations about the application of the UPC are delegated to

the Market Integrity/Mutual Funds Division of NASD.  Id. at ¶ 4.


In its supplementary submission, the debtor accurately sets forth the

applicable UPC rules.

> According to the UPC, the proper recipient of a distribution is
> determined by first establishing two "dates" in relation to the
> distribution:  the "record date" and the "ex-date" (or "ex-dividend
> date").  "Record date" refers to "the date fixed by the . . . issuer for
> the purpose of determining the holders of equity securities . . .
> entitled to receive dividends . . . or any other distributions."  UPC
> Rule 11120(e).  "Ex-date" means "the date [established by NASD
> pursuant to the UPC] on and after which the security is traded
> without a specific dividend or distribution."  UPC Rule 11120(c)
> Taken together, these two dates delimit the timeframe during
> which a security, when sold, carries with it from the seller to the
> buyer the right to receive a distribution.  See UPC Rule 11140.
> According to Proto [Carla Proto, a Specialist with the NASD Market
> Integrity/Mutual Funds Division who provided an affidavit in
> connection with this matter], NASD is endowed with the exclusive
> authority to establish "ex-dates" pursuant to the UPC.  (Id.; Proto
> Aff. at ¶ 6).

In its "Notice to Members 00-54," dated August 2000 and proffered as Exhibit 3 to the Proto affidavit, NASD explains to market participants precisely how "record dates" and "ex-dates" work in practice to ensure uniform, orderly and dependable market operations with respect to distributions:

> "[S]ubparagraph (b)(2) of [UPC] Rule 11140 provides that for dividends or distributions that are 25 percent or greater of the value of the subject security, the ex-date shall be the first business day following the payable date.  For example, if an issuer has announced August 10 as the record date and August 31 as the payable date, then the ex-date will be September 1, the first business day after the payable date.  In this example, September 1 is the day on or after which a buyer would purchase the security without the dividend and, therefore, the day on which the price of the stock is adjusted downward.  In this example, a seller of the security on August 15, *even though the holder of record to receive the dividend, would have to relinquish the dividend to the buyer.* Indeed, because the value of the security on August 15 has not yet been adjusted downward to reflect the dividend distribution, *the seller in this example would be unjustly enriched by keeping the dividend.*  The seller would have received the value of the dividend twice: first as fully reflected in the unadjusted price of the stock on August 14; and secondly, as subsequently paid by the company to record date holders.

NASD Notice to Members 00-54 at 372 (Proto Aff. at Ex.3) (emphasis added.)

Reorganized Debtors' Suppl. Submission at 3-4 (footnote omitted).

Courts have confirmed that the sale of stock "ex dividend" transfers the stock without entitlement to a previously accrued dividend.  <u>Compaq Computer</u>

Corp. and Subsidiaries v. C.I.R., 277 F.3d 778, 779 (5th Cir. 2001).  The

purchase of a stock on or before the record date is referred to as "cum

dividend" and entitles the purchaser to any declared dividend.  As the

Limbaugh court explained,

> The record date is the date on which one must be registered as a
> shareholder on the stock book of a company in order to receive a
> dividend declared by that company.  The fact that an individual is
> the holder of record on the record date, however, does not
> necessarily mean that such person is entitled to retain the
> dividend.  In terms of entitlement, the ex-dividend date is the
> dividing line. . . .  When stock is sold prior to the ex-dividend date,
> the right to a dividend goes with the stock to the purchaser, rather
> than staying with the seller.  . . .  Generally the ex-dividend date
> precedes the record date, and the stockholder entitled to the
> dividend is the individual to whom the dividend is sent.

Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 732 F.2d 859, 861

(11th Cir. 1984).

> When the amount of the dividend exceeds twenty-five percent or
> greater of the value of the security, however, . . . the ex-dividend
> date is "the first business day following the payable date." (NASD
> Uniform Practice Code Rule 11140(b)(2)).  In those situations, the
> ex-dividend date is the cut-off date which determines the
> entitlement of a declared dividend:  Whoever owns the shares as of
> the ex-dividend date, irrespective of the record date, is entitled to
> the dividend in question. (See NASD Notice 00-54).

In re Arbitration Before New York Stock Exchange, Inc., No. 04 Civ. 488(RWS),

2004 WL 2072460 at *16 (S.D.N.Y.  Sept. 8, 2004).  See Debtor's Suppl.

Submission, Exh. 2 (copy of Rule 11140) and Exh. 3 (copy of NASD Notice 00-

54) to Exh. A. (Aff. of Carla A. Proto).

-17-

In this case, on or about April 28, 2005, NASD received notice regarding the distributions to be made pursuant to the debtor's confirmed Chapter 11 plan. Debtor's Suppl. Submission, Exh. A. (Aff. of Carla A. Proto) at 2-3. By e-mail sent on May 20, 2005, the debtor confirmed that the Effective Date of the plan "will occur as of the close of business today." Pursuant to the notices, Proto, on behalf of NASD,

> established May 23, 2005, which was the next business day after May 20, 2005 as the "ex-date" for the THRC distribution pursuant to the method set forth in UPC Rule 11140(b)(2) and issued UPC Advisory #044-2005 to disseminate such information. Specifically, I set the ex-date for the distribution as May 23, 2005 in accordance with UPC Rule 11140(b)(2), because the distribution was 25% or greater of the value of the old Trump securities, and the rule provides that in this situation, the ex-date is the next business day.

Id. at 3. The effect of the advisory was to remind participants "that all over the counter sales of the stock made after the record date and before the ex-date were governed by the NASD rules and were made with a 'due bill.'" Debtor's Suppl. Submission at 8. "In other words, during the period between the record date and the ex-date, the right to receive the distribution was transferred with a share of Old THCR Common Stock from the seller to the buyer." Id.

On May 23, 2005, DTC notified its participants of the NASD Advisory and commenced the distribution to its participants. Debtor's Suppl. Submission, Exh. B. (Decl. of Patricia Mobley) at 3. Following the guidelines of the Advisory,

DTC explains:

> In order to allocate the Distributions among its Participants, DTC's computer system generated an electronic securities position report, from information maintained on DTC's computerized book entry system, reflecting Participant's close-of-business position in Old THCR Common Stock as of the Record Date, March 28, 2005.
>
> DTC's system then calculated its Participants' respective entitlements to the Distribution by accounting for all subsequent trading activity among them in the shares of Old THCR Common Stock that had been held by DTC as the holder of record as of the Record Date.  Any transfers of those securities among DTC's Participants, or their customers, between the Record Date and the Ex-Date included the transfer of the right to the Distribution in accordance with NASD's Uniform Practice Advisory (UPC #044-2005).
>
> In other words, in arriving at the allocation of the Distribution among its Participants, DTC treated all shares of Old THCR Common Stock that were transferred among DTC's Participants, or their customers, after the Record Date and before the Ex-Date, as carrying a "due bill" entitling the transferee, rather than the transferor, to the Distribution.

Id. at 3-4.

I conclude that the distribution by the debtor to DTC, and by DTC to its participants under the guidelines promulgated by the NASD, conforms with the debtor's confirmed Chapter 11 plan as well as the UPC.  The description of Class 11 claimants as the "beneficial owners" of Old THCR Common Stock is not inconsistent with the distribution made to holders of record as of March 28, 2005.  Distributions, for purposes of Class 11, were tied to the

record date of March 28th.  Distributions made to DTC, who held in name only

on behalf of participant brokers and financial institutions, who in turn held

shares on behalf of their customers, the ultimate beneficial holders, were then

subject to NASD rules and advisories.  Because the movants elected to sell

their shares after the record date but prior to the ex-dividend date, the right to

the distribution traveled with the shares sold to the new purchaser.  I conclude

on this record that the manner of distribution by the debtor was proper and in

conformance with the Record Date and provisions of the confirmed Chapter 11

plan.  The motion to enforce the Record Distribution Date is denied.


    Debtor's counsel shall submit an order in conformance with this opinion.



Dated:  February 17, 2006              ____/s/ *JUDITH H. WIZMUR*_____
                                       JUDITH H. WIZMUR
                                       CHIEF U.S. BANKRUPTCY JUDGE

-20-